UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**AMANDA L. WEAGRAFF**,                              Case No. 1:11 CV 2420

            Plaintiff,                              Judge Patricia A. Gaughan

      v.                              REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL
SECURITY**,

           Defendant.                              Magistrate Judge James R. Knepp II

## INTRODUCTION

Plaintiff Amanda L. Weagraff seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). This case was referred to the undersigned for the filing of a Report and Recommendation pursuant to Local Rule 72.2. (Non-document entry dated November 9, 2011). For the reasons given below, the undersigned recommends affirming the Commissioner's decision denying benefits.

## BACKGROUND

On April 7, 2008, Plaintiff filed applications for DIB and SSI alleging a disability onset date of January 1, 2006. (Tr. 86, 89). Her claims were denied initially (Tr. 63, 66), and on reconsideration (Tr. 72, 74). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 77). Born May 13, 1983, Plaintiff was 26 years old when the hearing was held on April 27, 2010. (Tr. 29, 32). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 18, 24). In her Brief on the Merits, Plaintiff only challenges the ALJ's conclusions on her mental impairments (*see* Doc. 17), and therefore waives

any claims about the ALJ's determinations regarding physical impairments. *See, e.g., Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517–18 (6th Cir. 2010) (noting failure to raise a claim in merits brief constitutes waiver). Therefore, the Court addresses only pertinent mental health records below.

Vocational History

Plaintiff attended high school through tenth grade. (Tr. 117). She has prior work experience in the following areas: bussing, hostessing, waitressing, and preparing food at restaurants; working as a cleaner or housekeeper; working as a cashier; working inventory; working as a laborer; working as a STNA at a nursing home; telemarketing; and working as an adult entertainer. (Tr. 113). Plaintiff claims she left several jobs because she lost interest or became paranoid about her coworkers "coming after [her]". (Tr. 147).

Medical History

When Plaintiff was 16, she was hospitalized for attempting to commit suicide by overdosing on Tylenol. (*See* Tr. 339–53). She has a history of polysubstance abuse, and on June 7, 2007, Plaintiff was admitted to a 90 day rehabilitation program due to crack cocaine, marijuana, and alcohol abuse. (Tr. 204, 206, 221). The rehabilitation program followed an incident during which Plaintiff's son was taken into CSB custody after Plaintiff failed her drug screens. (Tr. 206). Crack cocaine and alcohol were the root of Plaintiff's addiction, and she indicated treatment was very important to her. (Tr. 207–08). Plaintiff also reported she had trouble finding and holding jobs due to her alcohol and drug use. (Tr. 211). At the initial rehab evaluation, Plaintiff appeared well-groomed, cooperative, and calm, with an appropriate affect. (Tr. 214). She showed no evidence of hallucinations, delusions, or suicidal or homicidal ideation. (Tr. 215). She was oriented to time,

2

place, and person, her memory was intact, and her intellect was above average. (Tr. 215). Plaintiff reported trouble with depression and anxiety attacks, indicating in the past she experienced hallucinations, trouble understanding, concentrating, remembering, and anger problems. (Tr. 215). She also said she thought she had bipolar disorder, and her need for psychological treatment was rated "moderate". (Tr. 215–16).

As treatment progressed, Plaintiff was usually attentive and appropriate regarding peer comments, feedback, and group sessions and projects; actively sought employment; and progressed well through treatment. (Tr. 366, 368–70, 376, 380–81, 384–86, 388–89, 391, 396–99, 402, 420, 423–26, 429–30, 432, 448–49, 452, 456, 459, 461–62, 469, 473–74). Specific notes from various occasions indicate Plaintiff "appeared to enjoy . . . interaction w/ community members" (Tr. 389), "share[d] duties well[,] and ha[d] initiative" (Tr. 396). On September 3, 2007, Plaintiff explained she had secured a job at Old Navy and was excited, positive, and determined. (Tr. 361). On October 10, 2007, Plaintiff discussed relationship and peer problems, but also stated she was considering obtaining her GED. (Tr. 359). Plaintiff was discharged from treatment on November 4, 2007, after completing 90 days of treatment. (Tr. 204). At discharge, Plaintiff's GAF was 60. (Tr. 204). She was referred to a relapse prevention program, and her prognosis was fair. (Tr. 205).

Plaintiff first saw treating psychiatrist Dr. Samar El-Sayegh at North Coast Counseling on January 7, 2008 for a psychiatric evaluation. (Tr. 266). Plaintiff reported thoughts of cutting herself, and anxiety, explaining she easily becomes agitated, irritable, and frustrated. (Tr. 266). Plaintiff was going through stress with her child's father, who was being released from prison. (Tr. 266). Plaintiff was not interested in resuming the relationship, as he had been abusive. (Tr. 266). Plaintiff complained of decreased sleep, decreased concentration, decreased interests, tiredness, and mood

swings. (Tr. 266). She reported her suicide attempt at age 16, but had no current suicidal ideation. (Tr. 266). Plaintiff was oriented to time, place, and person, had good eye contact, was cooperative, and had good attention. (Tr. 267). Her insight and judgment were good, but she appeared slightly anxious. (Tr. 267). Dr. El-Sayegh diagnosed bipolar affective disorder, not otherwise specified, and assigned a GAF of 60. (Tr. 267). He recommended Plaintiff begin taking Depakote and suggested individual therapy. (Tr. 268).

Plaintiff attended counseling on January 30, 2008 and was well-groomed, with no suicidal or homicidal ideation and no evidence of psychosis. (Tr. 265). Though she changed topics abruptly and was sometimes difficult to follow, Plaintiff's mood was elevated. (Tr. 265). She reported being diagnosed with bipolar disorder and wondered if she could be excused from work until she worked through her issues. (Tr. 265). She also reported insomnia had caused her to fail to show up at work, and explained she thought Depakote was causing her sleep difficulties. (Tr. 265). The counselor reminded Plaintiff she could work on her issues while remaining in the workforce and encouraged her to decrease her caffeine consumption. (Tr. 265). On February 7, 2008, Plaintiff reported her difficulties with Depakote to Dr. El-Sayegh, but also reported being less irritable, with fewer mood swings. (Tr. 264).

In February 2008, Plaintiff was discharged from her relapse prevention program. (Tr. 200). The discharge summary states Plaintiff had no emotional, behavioral, or cognitive conditions or complications. (Tr. 201). She made therapeutic gains and was assessed as a low-risk for relapse potential. (Tr. 201). Plaintiff obtained sponsorship and documented 12-step meeting attendance, and also learned coping skills. (Tr. 202). The discharge summary states Plaintiff "made excellent progress" and maintained sobriety. (Tr. 202).

On March 10, 2008, Dr. El-Sayegh noted Plaintiff had stopped taking her medication on her own, stating she was becoming more depressed. (Tr. 263). She had increased irritability and anxiety and did not want to resume taking Depakote. (Tr. 263). Dr. El-Sayegh prescribed Seroquel. (Tr. 263). On March 24, 2008, Dr. El-Sayegh reported Plaintiff was tolerating Seroquel and her sleep and mood had improved, but she was still irritable. (Tr. 261). Plaintiff also attended counseling that day, where she was cheerful but she reported irritability and decision-making difficulty. (Tr. 262). On April 7, 2008, Plaintiff appeared for counseling again. (Tr. 260). Her mood was irritable and she reported feeling overwhelmed caring for her son, stating she needed some "Mommy Time." (Tr. 260). When Plaintiff saw Dr. El-Sayegh on April 21, 2008, he reported she remained medication-compliant, but felt more irritable and had elements of social anxiety. (Tr. 258). Plaintiff also reported panic attacks and difficulties with her son. (Tr. 258). Plaintiff also presented for counseling on April 21, 2008. Her clothes were clean and appropriate and her hygiene appeared intact. (Tr. 259). Plaintiff's mood was depressed, and she reported lacking energy and motivation since the last session. (Tr. 259). Plaintiff also indicated family and relationship issues, but Plaintiff remained sober. (Tr. 259). On July 22, 2008, Plaintiff returned to Dr. El-Sayegh. (Tr. 257). He adjusted her medications, and reported Plaintiff remained clean and sober and planned to begin exercising. (Tr. 257). Plaintiff went to counseling on August 22, 2008 and presented with a pleasant mood, proper dress and grooming, and fair eye contact. (Tr. 255). Plaintiff reported issues with her son's behavior. (Tr. 255). She claimed medication compliance and denied any suicidal or homicidal ideation. (Tr. 255).

Plaintiff attended counseling and saw Dr. El-Sayegh on a fairly regular basis until summer 2009. During this time, she intermittently reported high stress levels (Tr. 253), insomnia (Tr. 252),

memory problems (Tr. 251), social issues (Tr. 251), increased depression (Tr. 250, 259, 276), and anxiety (Tr. 278). Plaintiff explained her episodes of depression at times make her feel as though she cannot get out of bed and get things done. (Tr. 334). She reported most days she feels like she wants to sleep, and lacks interest in accomplishing things or engaging in leisure activities. (Tr. 334). The vast majority of the records, however, indicate Plaintiff's condition was improving. Plaintiff's affect was generally calm and pleasant (Tr. 251–52); her mood was generally pleasant, good, or even cheerful (Tr. 251–52, 262, 316, 332); she was properly dressed, well-groomed, cooperative, maintained fair eye contact, and participated actively (Tr. 251–52, 255, 260); and she was compliant with her medications (Tr. 250, 276, 295, 311, 315, 332). Further, at the vast majority of her appointments, Plaintiff remained sober, denied suicidal or homicidal ideation, denied hallucinations, and denied increased depression or anxiety. (Tr. 251–52, 295, 308, 311, 315–16, 328, 332, 334). Multiple records state Plaintiff was doing well and improving overall, or show she was excited about developments in her life. (Tr. 277–78, 307–08, 311).

Plaintiff's treatment became more sporadic beginning in June 2009, when office notes indicate Plaintiff failed to respond to a letter. (Tr. 303). Plaintiff missed an appointment on July 8, 2009 and could not be reached by telephone. (Tr. 301). On August 27, 2009, Plaintiff reported she wanted to talk to someone to help her remain sober. (Tr. 295). Plaintiff was a no-show for her appointment with Dr. El-Sayegh on August 28, 2009. (Tr. 294). When the office called to remind Plaintiff of her September 24, 2009 appointment, Plaintiff did not answer. (Tr. 289).

On October 6, 2009, based on observations, the case manager on Plaintiff's son's case called the counseling office to express concerns about Plaintiff's drinking and the effect a relapse would have on her ability to care for her son. (Tr. 288). Plaintiff cancelled an appointment with Dr. El-

Sayegh on October 12, 2009. (Tr. 287). On October 15, 2009, Plaintiff again stated she wanted someone to help her remain sober, but denied any increased depression or anxiety. (Tr. 285). Plaintiff reported she had been drinking, but not much. (Tr. 285). She did not feel it was an issue and she denied needing treatment. (Tr. 285). Plaintiff did not appear for her appointment on October 22, 2009, and was also a no-show for her appointment with Dr. El-Sayegh on November 4, 2009. (Tr. 282–83). At her hearing, Plaintiff testified she relapsed on alcohol during the gap in her treatment, but became sober again in March 2010. (Tr. 39, 45).

Plaintiff did not return to Dr. El-Sayegh until February 24, 2010, when she stated she had been busy due to her son's behavioral problems. (Tr. 563). At that appointment, Plaintiff stated she had been feeling alone. (Tr. 563). Plaintiff attended counseling on March 3, 2010. (Tr. 568). At the visit she denied suicidal or homicidal ideation, denied hallucinations, and denied increased depression or anxiety. (Tr. 568).

Daily Activities

To maintain her mental health treatment, Plaintiff currently takes a number of medications, including Seroquel to treat anxiety, sleep issues, and mood swings; Lexapro to treat depression and mood swings; and Rozerem as needed when she has trouble sleeping. (Tr. 167). Plaintiff claims she has major mood swings, fears people, and has a lot of anxiety and depression. (Tr. 112). She further claims she is irritable, angry, and experiences a lot of frustration, explaining she feels she does not fit in and is paranoid. (Tr. 112). Stress and anxiety cause Plaintiff headaches and nausea. (Tr. 112).

Plaintiff lives in a Section 8 house with her young autistic son. (Tr. 34, 141). Plaintiff cares for her son, including getting him off to school with the help of his aunt. On a daily basis she wakes up, drinks coffee, gets dressed, and feels overwhelmed with her son. (Tr. 225). She and his aunt

7

clean the house together. (Tr. 142). The aunt helps Plaintiff with cooking and cleaning, and cares for Plaintiff's son while Plaintiff goes to daily AA meetings. (Tr. 142). Plaintiff reported she becomes paranoid throughout the day, worrying people are looking into her house. (Tr. 225). Plaintiff also reported her conditions limit her ability to concentrate, understand, remember, follow instructions, complete tasks, talk, and get along with others. (Tr. 146). Prior to her conditions, Plaintiff could stay calm and comfortable around people; she did not worry about hurting herself due to low self-esteem. (Tr. 142). Plaintiff explained she has difficulty sleeping. She becomes nervous before bed, wakes multiple times per night, has disturbing dreams, and sometimes experiences panic attacks. (Tr. 142).

Plaintiff can accomplish most personal care tasks without difficulties and needs no reminders to take care of personal needs. (Tr. 143). She occasionally forgets to take her depression medication, and her AA sponsor reminds her. (Tr. 143). Plaintiff prepares sandwiches daily, and her son's aunt helps prepare complete meals. (Tr. 143). Though she needs reminders and her son's aunt helps, Plaintiff performs household chores multiple times a week, including cleaning, laundry, and dishes. (Tr. 144). She does not do yard work. (Tr. 144). Plaintiff does not have a driver's license and claims she does not get out much, but she shops in stores for food approximately once a week and claims she overspends when she gets into a deep depression. (Tr. 144–45). Her hobbies include reading and watching movies, but she does not do these things very often and claims she lost interest in them because she "get[s] antsy". (Tr. 145). Plaintiff believes she could not sleep without medicine. (Tr. 225). At a psychiatric evaluation, Plaintiff did not report having friends or hobbies. (Tr. 225). She said she used to be able to ignore feeling scared around large groups, but can no longer work around people because she becomes angry for no reason. (Tr. 226).

8

Plaintiff goes to AA meetings and talks on the phone with people four times a week. (Tr. 145). She explains she becomes irritable when surrounded by a lot of people, feels trapped, and has panic attacks. (Tr. 145–46). She has memory difficulties, loses her trains of thought, and often isolates from others because she feels they are "against" her. (Tr. 146–47). Plaintiff explains she can pay attention for "[a]t least" ten minutes at a time. (Tr. 146). She  claims she handles stress poorly, becomes confused easily, and can have rapid behavior changes if she feels threatened. (Tr. 147). Due to her depression, Plaintiff reports she sometimes has to force herself to get out of bed and do "the simplest things". (Tr. 152, 162)

Plaintiff's sister and two of Plaintiff's close friends completed Third Party Function Reports. (*See* Tr. 168, 178, 188). Plaintiff's sister Tammy Weagraff sees Plaintiff weekly and speaks with her on the phone daily. (Tr. 178, 180, 184). She explained Plaintiff has always experienced abnormal sleep patterns, which makes her irritable. (Tr. 178). Plaintiff's sister reported Plaintiff can take care of herself, but sometimes has panic attacks outside the house and stays inside if she is experiencing depression. (Tr. 179). She also reported Plaintiff has trouble concentrating. (Tr. 179). Additionally, she reported Plaintiff suffers many anxiety symptoms and opined Plaintiff has marked restrictions in her activities of daily living and moderate social limitations, but she does not believe Plaintiff is unable to function independently outside her home. (Tr. 182–83). Plaintiff's sister also reported Plaintiff's moods fluctuate rapidly, she experiences many bipolar symptoms, and she suffers migraines. (Tr. 184–86).

Plaintiff's friend of six years, Jennifer Wilson, sees Plaintiff daily. (Tr. 168). She indicated Plaintiff is irritable most of the day and takes short naps throughout the day. (Tr. 168, 172). She explained Plaintiff suffers abnormal sleep patterns, insomnia, extreme fatigue, slurred speech,

accidents due to muscle control/strength, short term memory loss, depression, dizziness, and excessive daytime sleepiness. (Tr. 168). Ms. Wilson admitted Plaintiff can take care of herself "to an extent" but reported she suffers panic and depression attacks and cannot concentrate on projects for long periods. (Tr. 169). Ms. Wilson also explained Plaintiff suffers migraines. (Tr. 170). She further reported Plaintiff suffers a number of anxiety symptoms including hallucinations or paranoid thinking, has difficulty handling stress, cannot focus or concentrate, experiences heart palpitations, suffers panic attacks, appetite disturbance, sleep disturbance, and decreased energy, suffers hyperactivity, becomes short of breath, and is less social now than she once was. (Tr. 172).

Ms. Wilson believed Plaintiff's activities of daily living are markedly restricted by her mental issues. (Tr. 173). She believed Plaintiff has moderate difficulty maintaining social functioning and interacting appropriately with the public, but stated she does not think Plaintiff is unable to function independently outside her home due to her panic attacks. (Tr. 173). She stated Plaintiff is not comfortable being away from home for long periods and cannot focus for long enough to finish a project. (Tr. 175). Describing Plaintiff's bipolar disorder, Ms. Wilson said Plaintiff's mood can change from one extreme to the other within seconds and she is rarely calm and relaxed. (Tr. 174). She then noted a number of depressive and manic symptoms she has noticed in Plaintiff, including lack of interest, guilt and anxiety, delusions, paranoia, inflated self-esteem, extreme distractibility, rapid, incoherent thinking, and participation in dangerous or high risk activities. (Tr. 174).

Kevin Killeen has been a friend of Plaintiff's for seven years and sees her once or twice a week. (Tr. 188). He stated Plaintiff has abnormal sleep patterns and difficulty concentrating, but he said "she does manage to take care of herself, home, and child". (Tr. 188–89). He agreed Plaintiff

10

suffers migraines. (Tr. 196–97). Mr. Killeen also stated Plaintiff suffers a number of anxiety symptoms that cause marked restriction in her daily activities and moderate social difficulties, but he does not believe she is unable to function independently outside her home due to panic attacks. (Tr. 192–93). Mr. Killeen also explained Plaintiff has extreme mood swings. (Tr. 194). He said Plaintiff's house is always clean and she takes care of herself and her son, but she always seems overwhelmed and frustrates easily. (Tr. 195).

Mental Residual Functional Capacity (RFC) Assessments

*Dr. Margaret Zerba*

On June 28, 2008, Dr. Zerba evaluated Plaintiff. (Tr. 222–27). Plaintiff reported a history of family problems with her father and traumatic childhood events. (Tr. 222). Plaintiff reported she stopped abusing drugs and alcohol in June 2007, but did not seek mental health treatment until she was nine months sober because she wanted to make sure she was totally drug free before beginning mental health medications. (Tr. 223). Plaintiff reported being in good health other than her bipolar disorder, taking Seroquel and Lexapro, and seeing a psychiatrist two to three times a month. (Tr. 223). She also reported attending counseling three times a month, seeing her case manager twice a month, and attending a faith-based recovery program to help her maintain sobriety. (Tr. 223). Plaintiff explained she has gone through many jobs because she does well for a couple days, but then becomes paranoid and loses interest quickly. (Tr. 223). She feels people are out to get her and talk about her at work, but she has never been fired. (Tr. 223–24).

Plaintiff was cooperative, with good grooming and hygiene and well-organized flow of thought and conversation. (Tr. 224). She reported feeling depressed and presented with a depressed, flat affect. (Tr. 224). Though she attempted suicide at age 16, Plaintiff was not suicidal at the time.

(Tr. 224). She did report once having homicidal thoughts toward her child's father, who was physically and mentally abusive, but reported she did not currently have any homicidal ideation and had learned to stand up for herself. (Tr. 224). Plaintiff did not report anxiety problems or panic attacks, but she reported past auditory hallucinations of people telling her she is crazy. (Tr. 224–25). Plaintiff experienced some difficulty attempting serial sevens and her answers to hypothetical questions were simplistic and poor. (Tr. 225). Overall, Dr. Zerba found Plaintiff's cognitive functioning falls in the low-average range. (Tr. 225).

Dr. Zerba listed her diagnostic determinations as Schizophrenia, paranoid type; alcohol and cocaine abuse in sustained full remission; personality disorder, not otherwise specified; and a GAF of 30. (Tr. 226). She found Plaintiff's ability to understand and follow directions is not impaired. (Tr. 226). Neither did Dr. Zerba believe Plaintiff's ability to pay attention to perform simple, repetitive tasks is impaired. (Tr. 226). Dr. Zerba opined Plaintiff is markedly impaired in the following areas due to paranoid delusions, auditory hallucinations, and depression; relating to others in the work environment; and withstanding the stress and pressures of day-to-day work activity. (Tr. 226). She also stated Plaintiff is incapable of managing her own money. (Tr. 226).

*Dr. Douglas Pawlarczyk*

On July 23, 2008, Dr. Pawlarczyk assessed Plaintiff's mental RFC. (Tr. 229–31). He found her not significantly limited in the following areas:

(1) remembering locations and work-like procedures; (2) understanding and remembering very short and simple instructions; (3) carrying out very short and simple instructions; (4) sustaining an ordinary routine without special supervision; (5) working in coordination with or proximity to others without being distracted by them; (6) making simple work-related decisions; (7) asking simple questions or requesting assistance; (8) maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; (9) being aware of normal hazards and taking appropriate precautions; (10) traveling in unfamiliar places or using public

12

transportation; and (11) setting realistic goals or making plans independently of others.

(Tr. 229–30). He found her moderately limited in the following areas:

(1) understanding and remembering detailed instructions; (2) carrying out detailed instructions; (3) maintaining attention and concentration for extended periods; (4) performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; (5) completing a normal workday and workweek without interruptions from psychologically based symptoms; (6) performing at a consistence pace without an unreasonable number and length of rest periods; (7) accepting instructions and responding appropriately to criticism from supervisors; (8) getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (9) responding appropriately to changes in the work setting.

(Tr. 229–30). Dr. Pawlarczyk found Plaintiff markedly impaired only in her ability to interact appropriately with the general public. (Tr. 230).

Citing reports Plaintiff cares for her child, cooks, and does household chores but spends little time with others, Dr. Pawlarczyk opined Plaintiff "could perform simple, repetitive work tasks in an environment with no strict production quotas and where no public contact is required and contact with coworkers is minimal." (Tr. 231). Dr. Pawlarczyk also found Plaintiff has only mild limitations in her activities of daily living; moderate difficulties maintaining social functioning and maintaining concentration, persistence, or pace; and one or two episodes of decompensation. (Tr. 243). Overall, Dr. Pawlarcyzk found Plaintiff's statements generally consistent with medical evidence, and he gave weight to Dr. Zerba's findings, except her conclusions that Plaintiff's social functioning and stress tolerance are markedly rather than moderately impaired. (Tr. 231).

ALJ Hearing

At the hearing, Plaintiff's attorney noted that even though Dr. Zerba's evaluation listed schizophrenia, Plaintiff did not recall ever being diagnosed with schizophrenia and focused on

13

difficulties due to bipolar disorder. (Tr. 33). Plaintiff testified her medications help her mental impairments "[t]o a certain point", explaining she still has outbursts, agitation, or depression. (Tr. 36). She further testified she can care for her son, do housework routinely, and shop for groceries with help. (Tr. 36–38). Regarding social relationships, Plaintiff testified she has a few close friends but becomes very nervous and choked up and gets headaches when she deals with anyone new or with authority figures. (Tr. 38). Plaintiff testified she briefly relapsed on alcohol but had been drug-free since 2007. (Tr. 39, 50). She explained she had a history of emotional problems and attended counseling as a child (Tr. 44), had issues with racing thoughts, paranoia, and anger while she was using drugs and alcohol and felt substance-abuse worsened her mental impairments (Tr. 43, 45), and continued having emotional problems once she became sober (Tr. 45–49). Specifically, Plaintiff is paranoid about people talking about her behind her back, lacks confidence, fears crowds and being stared at, and isolates herself at home frequently. (Tr. 45, 48–49). Though Plaintiff does go grocery shopping with her sponsor, she described the experience as hectic – especially when her son misbehaves. (Tr. 49). By the end of a shopping trip she is nervous, anxious, and needs to hurry to leave the store. (Tr. 49).

Plaintiff told the ALJ her last job was at Goodwill Industries. (Tr. 51). It was too stressful for her to work downstairs, where it was crowded, because she would become very nervous and jumpy. (Tr. 52). Plaintiff then worked with the receptionist, which was a quieter environment, but still caused her stress due to the amount of multi-tasking required. (Tr. 52). At Goodwill, Plaintiff would ask to be excused approximately three times a day, for approximately five to eight minutes at a time, to smoke a cigarette and clear her head. (Tr. 54–55). Ultimately, Plaintiff left Goodwill because she felt it was too much for her and she was paranoid her coworkers disliked her repeated

14

questions about how to perform tasks properly. (Tr. 53–54).

The ALJ presented one hypothetical to the VE, asking her to consider a person of Plaintiff's age, education, and work experience, who could perform light work subject to a number of physical limitations, and could perform simple or basic one, two, or three-step job tasks without frequent interaction with the general public or co-workers. (Tr. 56). The VE identified two jobs existing in significant numbers in the national economy that such a person could perform: mail sorter (170,000 jobs nationally; 5,800 jobs in Ohio); and plastic products assembler (500,000 jobs nationally; 27,000 jobs in Ohio). (Tr. 56). Plaintiff's attorney added three limitations to the hypothetical: (1) three unscheduled work breaks on a daily basis; (2) a marked limitation in the ability to interact with supervisors, coworkers, or the public; and (3) a marked inability to handle stress. (Tr. 57). The VE testified any of these additional limitations would preclude a person from employment. (Tr. 57).

ALJ Decision

The ALJ determined Plaintiff's date last insured to be September 30, 2009 and found she had not engaged in substantial gainful activity since January 1, 2006, her alleged onset date. (Tr. 13). The ALJ determined Plaintiff has two severe impairments – a bipolar disorder and an anxiety disorder – but found these impairments do not meet or medically equal a listing. (Tr. 13–15). He found Plaintiff has only mild restriction in activities of daily living, noting she is a single parent and primary caregiver of a young autistic child, regularly attends counseling sessions, and "daily prepares simple meals, cleans, does laundry[,] . . . does dishes . . . shop[s] in stores", and told her psychiatrist she had started an exercise program. (Tr. 16). In social functioning, the ALJ found Plaintiff has moderate difficulties. He also found she has moderate difficulties with concentration, persistence, or pace, and only one or two episodes of decompensation throughout her life. (Tr. 16).

15

The ALJ determined Plaintiff retains the RFC to perform a wide range of light work, subject to a number of physical limitations, and the following mental limitations: Secondary to mental impairments, she can understand, remember, and carry out simple instructions and perform simple, routine, and repetitive tasks, consistent with unskilled work activity; and (2) secondary to moderate social limitations, she is to have no frequent interaction with the general public or coworkers. (Tr. 17–18). The ALJ further found Plaintiff can "perform sustained work activity on a regular and continuous basis for eight hours per day, forty hours per week with normal breaks being sufficient." (Tr. 18). In reaching this RFC determination, the ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects not credible to the extent they were inconsistent with the RFC. (Tr. 18). He found Dr. Zerba's GAF of 40, indicating major impairment, inconsistent with Plaintiff's responsibility as the primary caregiver for her son, and "wholly inconsistent" with Dr. El-Sayegh's progress notes. (Tr. 20). Citing Plaintiff's progress notes and her daily activities, the ALJ found the evidence showed Plaintiff is "more functional than she alleges." (Tr. 22). The ALJ gave Dr. Zerba's psychological evaluation only moderate weight because like Dr. Pawlarczyk, he disagreed with her assessment of marked limitations, as those findings were inconsistent with Dr. El-Sayegh's findings. (Tr. 22). The ALJ gave Dr. Pawlarczyk's opinion significant weight. (Tr. 22).

The ALJ found Plaintiff cannot perform her past relevant work, but found she can perform jobs existing in significant numbers in the national economy, based on VE testimony. (Tr. 22–23). Therefore, the ALJ found Plaintiff "not disabled". (Tr. 24). The Appeals Council denied review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

16

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can she perform past relevant work?

5. Can the claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff alleges the ALJ erred at steps four and five by formulating a RFC for Plaintiff that does not accommodate the limitations he found at step three, and which led to VE testimony that cannot serve as substantial evidence Plaintiff can perform work. (Doc. 17, at 8). For the reasons explained below, the Court should find the ALJ did not err in his step four and five determinations.

*Ealy* and Moderate Difficulties Maintaining Concentration, Persistence, and Pace

Plaintiff cites *Ealy v. Commissioner of Social Security*, 594 F.3d 504 (6th Cir. 2010), and its progeny to argue the ALJ did not accurately convey Plaintiff's concentration, persistence, and pace impairments. (Doc. 17, at 8–11). Under the facts of this case, however, and in light of relevant Sixth Circuit and district court case law, the Court should find the ALJ's hypothetical and subsequent ruling were not flawed. In the ALJ's hypothetical, he included the limitation of "simple or basic one,

18

two, three-step job tasks without frequent interaction with the general public or co-workers." (Tr. 56). In his decision, the ALJ found Plaintiff has moderate difficulties with regard to concentration, persistence or pace. (Tr. 16). The ALJ ultimately determined that – secondary to her mental impairments – Plaintiff's RFC allows her to understand, remember, and carry out simple instructions and perform simple, routine, and repetitive tasks "consistent with unskilled work activity", and used the jobs supplied by the VE in response to his hypothetical find Plaintiff not disabled at step five. (Tr. 18–23).

For a VE's testimony in response to a hypothetical question to serve as substantial support for the conclusion a claimant can perform other work, the hypothetical must accurately portray a claimant's physical and mental impairments. *Ealy*, 594 F.3d at 504 (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)). In *Ealy*, the Sixth Circuit found the functional restrictions recited in an ALJ's hypothetical question insufficient to accommodate for the claimant's medically-established difficulties in concentration, persistence, and pace because the hypothetical omitted speed- and pace-based restrictions completely, and instead only limited the individual to simple, repetitive tasks. *Id.* at 516. This prevented the VE's testimony from providing substantial support for the Commissioner's decision at step five.

"[T]here is a body of case law supporting the proposition that hypotheticals limiting claimants to jobs entailing no more than simple, routine, and unskilled work are not adequate to convey *moderate* limitations in ability to concentrate, persist, and keep pace." *Johnson v. Astrue*, 2010 WL 5559542, at *8 (N.D. Ohio 2010) (emphasis in original); *see also, e.g., Edwards v. Barnhart*, 383 F.Supp.2d 920, 930 (E.D. Mich. 2005) ("Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job."). This district has

19

applied *Ealy* to remand the Commissioner's decisions when an ALJ's hypothetical failed to adequately convey moderate concentration, persistence, and pace difficulties. *See, e.g., Titus v. Astrue*, 2011 WL 6986793, at *6–8 (N.D. Ohio 2011); *Frye v. Astrue*, 2012 WL 1831548 (N.D. Ohio 2012).

But the Sixth Circuit has also said, citing *Ealy*, that while "the [hypothetical] question must accurately portray a claimant's physical and mental impairments", the hypothetical question "need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 865 (6th Cir. 2011) (citing *Ealy*, 594 F.3d at 516; *Casey*, 987 F.2d at 1235). There, the Sixth Circuit held an ALJ's determination the plaintiff could receive no more than simple instruction reflected a physician's opinion he had a limited ability to understand and remember, and also reflected his prior skilled and semi-skilled work experience, "as he necessarily received at least simple instruction at his previous jobs." *Parks*, 413 F. App'x at 866.

Some courts in this district have taken the position *Ealy* stands not for the general proposition that moderate limitations in concentration, persistence, and pace require more than a simple, repetitive tasks restriction; rather, some say *Ealy* is "a limited, fact-based[] ruling in which the claimant's particular moderate limitations required additional speed- and pace-based restrictions." *Todd v. Astrue*, 2012 WL 2576435, at *11 (N.D. Ohio 2012) (citing *Jackson v. Comm'r of Soc. Sec.*, 2011 WL 4943966, at *4 (N.D. Ohio 2011)). In *Todd*, the ALJ found the plaintiff had moderate restrictions in concentration, persistence, or pace, and the hypothetical posed to the VE stated the person could "remember locations and procedures, c[ould] perform activities within a schedule, c[ould] do an ordinary routine independently, c[ould] work without distraction, c[ould] make work-related decision, [wa]s willing to ask questions or seek assistance, c[ould] accept

20

instructions and criticism, and [wa]s able to respond to work changes." *Todd*, 2012 WL 2576435, at *6. Further, the person could not do complex tasks, but could do simple, routine tasks. *Id.*

According to the court, the ALJ did more than simply limit the plaintiff to simple, routine, or repetitive facts, because he also made a number of specific determinations, finding – among other things – Plaintiff could remember and carry out simple instructions, and respond appropriately to supervision, coworkers, and usual work situations. *Id.* at *11. Moreover, the court said the plaintiff had not shown he suffered speed- or pace-based restrictions related to his moderate limitations. *Id.* Under those facts, the hypothetical was not flawed, and the court affirmed the ALJ's conclusion. *Id.* at 11–12.

Even before *Todd*, this district found "*Ealy* does not require further limitations in addition to limiting a claimant to 'simple, repetitive tasks' for every individual found to have moderate difficulties in concentration, persistence, or pace." *Jackson*, 2011 WL 4943966, at *4. Instead, the court said, *Ealy* advocates a fact-based approach to determine whether, considering the record evidence, the plaintiff required specific limitations regarding his or her moderate difficulties with concentration, persistence, or pace. *Id.* In *Jackson*, after the ALJ reviewed the plaintiff's physical and mental impairments, he concluded the plaintiff "was limited to performing simple, routine tasks that do not involve contact with the general public and brief, superficial contact with coworkers and supervisors." *Id.* He further concluded, "nothing in the record . . . convinces me that any further reduction in the residual functional capacity I have assessed would be justified." *Id.* Affirming the ALJ's decision, the court distinguished *Ealy*, saying the *Ealy* plaintiff had presented evidence showing the plaintiff's limited ability to maintain attention over time, even when performing simple, repetitive tasks. *Id.* In *Jackson*, however, the plaintiff referred to no such evidence suggesting her

21

limitations were greater than those the ALJ identified. *Id.*

Considering the facts in Plaintiff's case under *Ealy*, *Parks*, and other case law, the ALJ did not err in the hypothetical he posed to the VE, as it sufficiently incorporated the limitations he ultimately determined in Plaintiff's RFC. The hypothetical asked the VE to consider a person who could perform simple, one-to-three-step tasks without frequent interaction with the general public or coworkers. (Tr. 56). In his decision, the ALJ determined Plaintiff has moderate difficulties with regard to concentration, persistence, or pace (Tr. 16) and determined Plaintiff retains the RFC to understand, remember, and carry out simple instructions and perform simple, routine, and repetitive tasks consistent with unskilled work activity. (Tr. 18). But the ALJ did not merely limit the Plaintiff to simple, routine, repetitive tasks; he also made a number of other specific determinations. Namely, he found Plaintiff can perform sustained work activity, on a regular and continuous basis for eight hours per day, forty hours per week, with normal breaks being sufficient. (Tr. 18).

The ALJ gave moderate weight to Dr. Zerba's opinion, discounting those portions of her opinion indicating Plaintiff has marked limitations relating to others and withstanding the stress and pressure of daily work activity. (Tr. 16; 226). However, Dr. Zerba also specifically found Plaintiff was not impaired in her abilities to understand and follow directions or pay attention to perform simple, repetitive tasks. (Tr. 226), and the ALJ did not disregard that opinion. To the contrary, he cited that opinion directly after finding Plaintiff has moderate difficulties with concentration, persistence, or pace. (Tr. 16). This can reasonably be read as the ALJ crediting Dr. Zerba's opinion that – despite moderate difficulties – Plaintiff can still understand, follow directions, and pay attention to perform simple, repetitive tasks. This reading is further supported by the ALJ including in his RFC determination a finding that Plaintiff can perform sustained work activity on a regular

22

and continuous basis for an entire workday and workweek, with normal breaks being sufficient.

Dr. Pawlarcyzk found Plaintiff moderately limited in maintaining concentration, persistence, and pace (Tr. 243), specifically opining Plaintiff is moderately impaired in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual, and complete a normal workday and workweek. (Tr. 229–30). Plaintiff argues the ALJ adopted Dr. Pawlarczyk's entire opinion when he assigned it significant weight (Doc. 17, at 10), but the ALJ did *not* adopt each segment of Dr. Pawlarczyk's opinion. The ALJ agreed with Dr. Pawlarczyk that Plaintiff is moderately limited in her ability to carry out detailed instructions, and he credited that opinion by limiting Plaintiff to simple one-to-three-step tasks. The ALJ also appears to have credited Dr. Pawlarczyk's opinion that Plaintiff is not significantly limited in her ability to understand, remember, and carry out very short and simple instructions, because he limited Plaintiff to simple tasks. (Tr. 229). But the ALJ's RFC found Plaintiff *can* perform sustained work activity, on a regular and continuous basis, for an entire workday and workweek, with normal breaks being sufficient – indicating the ALJ did not adopt Dr. Pawlarcyzk's opinion with regard to Plaintiff's difficulties with attendance and ability to complete a normal workweek.[1]

Further, although Dr. Pawlarczyk opined Plaintiff could perform simple, repetitive tasks in an environment with no strict production quotas (Tr. 231), the ALJ could not have adopted this entire opinion. First, the ALJ did not mention this opinion when he found Plaintiff has moderate

---

1. Further, the record supports this determination. Even if Plaintiff's testimony is accurate and she really did require multiple additional breaks per day while she worked at Goodwill (Tr. 54–55), the ALJ found she cannot perform her past work (Tr. 22). Testimony about additional breaks she required at a position she cannot perform does not answer whether she would need additional breaks at the type of position the ALJ determined she retains the RFC to perform.

difficulties with concentration, persistence, or pace. (*See* Tr. 16). Moreover, the ALJ's finding that Plaintiff can perform sustained work activity for an entire workweek, without additional breaks shows he did not ultimately agree Plaintiff suffers pace-based restrictions. And despite Dr. Pawlarczyk opining Plaintiff is moderately impaired in her abilities to complete a normal workday or workweek and perform at a consistent pace without an unreasonable number and length of rest periods (*see* Tr. 18, 230), the ALJ found just the opposite: He found Plaintiff does *not* require additional breaks, and can perform sustained, continuous work for an entire workday and workweek. Thus, while the ALJ assigned Dr. Pawlarczyk's opinion significant weight, he could not have adopted it in its entirety.

Despite finding Plaintiff suffers moderate limitations in concentration, persistence, or pace, the ALJ specifically found she can perform sustained work activity on a continuous basis for an entire workday and workweek, with normal breaks being sufficient, so long as she is limited to simple instructions and simple, routine, and repetitive tasks free from frequent interaction with the public or coworkers. The ALJ's hypothetical is only required to include those limitations he accepts as credible. *Casey*, 987 F.2d at 1235. Here, he did not determine Plaintiff has speed- or pace-based restrictions; thus, he was not required to include them in the hypothetical. As a result, the hypothetical was properly formulated, and the VE's testimony regarding jobs constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff is not disabled because she can perform work existing in significant numbers in the national economy.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and applicable law, this Court finds the Commissioner's decision denying SSI benefits supported by substantial evidence. The

24

undersigned therefore recommends the Commissioner's decision be affirmed.

_____s/James R. Knepp, II_____
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

25